COMMONWEALTH *vs.* DENNIS E. COOK.

Hampden.    September 8, 1980. — November 4, 1980.

Present: ARMSTRONG, BROWN, & GREANEY, JJ.

*Rape. Conspiracy. Accessory and Principal. Joint Enterprise.*

At the trial of an indictment charging conspiracy to commit rape, the judge erred in denying the defendant's motion for a required finding of not guilty where there was insufficient evidence to warrant an inference that the defendant had entered into an unlawful agreement or prior plan with his brother who raped the victim in the defendant's presence. [670-673]

In the circumstances, a defendant could not be convicted of conspiracy to commit rape solely on evidence tending to show his complicity as an accomplice in the commission of the substantive crime. [673-677]

INDICTMENT found and returned in the Superior Court on October 14, 1977.

The case was tried before *Alberti,* J.

*Roy H. Anderson* for the defendant.

*Henry L. Rigali,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. The defendant was tried before a jury in the Superior Court on an indictment charging conspiracy to commit rape. His motion for a required finding of not guilty (Mass.R.Crim.P. 25, 378 Mass. 896 [1979]), was filed and denied at the conclusion of the Commonwealth's case, and he was subsequently convicted and sentenced on the indictment. On appeal he claims error in the denial of the motion. We hold that the evidence introduced up to the time the Commonwealth rested (*Commonwealth* v. *Kelley,* 370 Mass. 147, 150 [1976]; *Commonwealth* v. *Rhoades,* 379 Mass. 810, 815 [1980]) was insufficient to warrant his conviction of conspiracy and that, as a result, the judgment

must be reversed. A summary of the Commonwealth's evidence follows.

At approximately 8:00 P.M. on the evening of July 16, 1977, the victim, age seventeen, went to Chicopee to visit some friends and to see her boyfriend. Upon discovering that her friends were not at home, she proceeded to the housing project where her boyfriend resided. As she passed the area of the project office, the defendant and his brother Maurice Cook attempted to engage her in conversation. Not knowing the Cooks, she spurned an invitation to join them and instead walked to her boyfriend's residence. After ascertaining that he was not at home, she reversed her route, intending to stay at her friends' home to await their return. As she passed the office area for the second time, she accepted the Cooks' renewed invitation to socialize, and she sat with the two brothers on a platform talking for approximately forty-five minutes. The area apparently was used as a common meeting point for informal socializing, and while the victim was there several other people were in the vicinity, one of whom recognized the victim and called her by name. There was evidence that the Cooks smoked marihuana and drank beer but that the victim declined to smoke marihuana because her boyfriend disliked her "flying high." She did take a drink of beer. The defendant told her that he and his brother were caring for a nearby home whose occupants were away on vacation. Because the victim was having difficulty remembering their names, the defendant told her that he worked at Smith and Wesson. He also showed her his plant identification card with his picture on it, and his brother informed her of his employer and his address and displayed his driver's license.

About 9:00 P.M. Maurice Cook indicated that he was out of cigarettes and suggested that the three walk to a convenience store located about a minute and a half away. The victim agreed. To reach the store, the trio proceeded along the street to a narrow path or trail located behind the project office. This path led down a hill through a wooded area to the rear of a well-lit service station adjacent to the conve-

nience store. As they "walk[ed] towards the path" single file (with Maurice in front, the victim in the middle and the defendant in the rear), the victim "slipped . . . fell or something." She sat on the ground for a few seconds laughing when "Maurice turned around and jumped on me . . . and told me I was going to love it." After she screamed, Maurice covered her mouth with his hand, took off his belt and gave it to the defendant seated nearby. Maurice then scratched her with a stick or blunt object and said, "No blood, no blood." The defendant was overheard laughing and saying. "The bitch doesn't want to bleed, we'll make her bleed." Maurice then forcibly raped her. During the assault the victim lost consciousness. She awoke about 11:00 P.M. and went directly to her friends' home. The incident was subsequently reported to the police, and the Cooks were arrested.[1] Maurice was indicted for rape and the defendant, in addition to the conspiracy indictment, was charged as an accessory to the rape. G. L. c. 274, § 2, as amended by St. 1973, c. 529, § 1.[2]

1. A combination of two or more persons who seek by some concerted action to accomplish a criminal act may be punished as a conspiracy. *Commonwealth* v. *Hunt*, 4 Met. 111, 123 (1842). *Attorney Gen.* v. *Tufts*, 239 Mass. 458,

---

[1] The Commonwealth has not argued that any of the events that occurred after the commission of the crime are probative on the question whether a conspiracy existed; accordingly we have not included those events in the summary of evidence.

[2] "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon." Although the fact of the accessory indictment is not included in the appendix, it is apparent that it is based on a theory of accomplice liability of the type discussed in *Commonwealth* v. *Morrow*, 363 Mass. 601, 608-609 (1973). As the *Morrow* decision points out, the terms accomplice, principal (in the second degree) and accessory are virtually synonymous when the facts involve presence at the scene and ability to aid the perpetrator. "Whether one is a principal or an accessory before the fact makes little difference, since he must be indicted, tried and punished as a principal." *Id.* at 609. The defendant has not been tried on the accessory indictment.

493 (1921). It is essential to a conviction that the Commonwealth prove the existence of an agreement, because "[t]he gravamen of . . . conspiracy . . . is the unlawful agreement." *Commonwealth* v. *Soule,* 6 Mass. App. Ct. 973 (1979). See Note, Agreement as an Element of Conspiracy, 23 Va. L. Rev. 898, 910 (1937) ("[T]he fundamental fact [is] that there is an agreement to be proved"). "It must [also] be shown that the defendant was aware of the objective of the conspiracy which was alleged." *Commonwealth* v. *Nelson,* 370 Mass. 192, 196 (1976). *Commonwealth* v. *Gill,* 5 Mass. App. Ct. 337, 348 (1977), and cases cited. Proof of a conspiracy may rest entirely or mainly on circumstantial evidence (*Commonwealth* v. *Stasiun,* 349 Mass. 38, 50 [1965]), but "some record evidence" is not enough (*Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 [1979]; *Commonwealth* v. *Dellinger, ante* 549, 554 [1980]), and an acquittal must be ordered if any essential element of the crime is left to surmise, conjecture or guesswork. *Commonwealth* v. *Kelley,* 359 Mass. 77, 88 (1971). *Commonwealth* v. *Duffy,* 4 Mass. App. Ct. 655, 659 (1976).

We are of the opinion that the evidence, tested against the foregoing principles, was insufficient to establish a conspiracy. The circumstances under which the victim and the Cooks met and socialized were not indicative of a preconceived plan between the defendant and his brother to commit a sexual assault. Rather, the meeting and subsequent engagement were consistent with a chance social encounter common between young persons. The area where the group stayed prior to setting out for the store was used frequently as a gathering spot, and there was no evidence either that the Cooks attempted to conceal from others the fact that they were with the victim or that they consciously attempted to mislead her as to their identities. The evidence cuts directly against any such inference because of the special efforts made by the defendant and his brother to identify themselves by disclosing their names and places of employment, and by showing the victim their photographs.

We do not think it plausible to infer that this conduct was an attempt by the Cooks to lull the victim into a false sense of security. Moreover, since all the conversation at the platform occurred in the victim's presence, the jury could not have properly inferred that a clandestine plan to commit an assault had been formulated during that period. While openness will not automatically sanitize a conspiracy, highly visible conduct has to be considered inconsistent with the shadowy environment which usually shrouds the crime. The purpose for leaving the area was on its face innocuous and was suggested by Maurice, not the defendant. While the route chosen was arguably suspicious, the evidence established that it also was selected by Maurice, not the defendant. There was evidence that the path provided a short, reasonably direct route to a gasoline station which was nearby, well-lighted, and visible from the crest of the hill. We do not think that the events up to the time the victim fell were sufficient to establish a criminal agreement or to warrant the jury in inferring the state of facts that the Commonwealth claims to have existed.

Nor was the prosecution's case strengthened by the circumstances surrounding the assault itself. There was no evidence that the defendant (or his brother for that matter) had anything to do with the victim's falling to the ground. The fact that Maurice's attack began immediately after the victim found herself in a compromising situation suggests spontaneity of action on his part rather than the purposeful execution of a predetermined plan. From that point on, the defendant's conduct fits the classic paradigm of an accomplice adding encouragement to a crime in progress. The fact that the defendant may have aided and abetted the crime does not, as will be discussed more fully in part 2 of this opinion, establish a conspiracy, particularly where the evidence shows that prior planning is not an inherent facet of the crime. "[N]either association with [a criminal] nor knowledge of illegal activity constitute proof of participation in a conspiracy." *Roberts* v. *United States,* 416 F.2d 1216, 1220 (5th Cir. 1969).

In reaching our conclusion, we are mindful of the principle that proof of a tacit agreement to commit a crime may be enough to establish a conspiracy. See Perkins, Criminal Law 615 (2d ed. 1969). But in this case it is just as reasonable to conclude that the defendant became implicated in the crime as an accomplice after it had commenced without any advance knowledge that it was to occur, as it is to infer that the minds of the parties had met in advance "understandingly, so as to bring about an intelligent and deliberate agreement to . . . commit the offense charged." *State* v. *Cole*, 107 *S.C.* 285, 288-289 (1917). "[W]hen the evidence tends to sustain either of two inconsistent propositions, neither . . . can be said to have been established by legitimate proof." *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), and cases cited.

2. The remaining question raised by the Commonwealth's argument is whether the defendant can be convicted of conspiracy *solely* on the evidence tending to show his complicity as an accomplice in the commission of the substantive crime. We think on the evidence in this case such a conclusion would be unjustified.

Accomplice and conspiratorial liability are not synonymous, and one can be an accomplice aiding in the commission of a substantive offense without necessarily conspiring to commit it. See *Pereira* v. *United States*, 347 U.S. 1, 11 (1954); *Iannelli* v. *United States*, 420 U.S. 770, 777 n.10 (1974); Marcus, The Prosecution and Defense of Criminal Conspiracy Cases 2-5 (1978); Developments in the Law — Criminal Conspiracy, 72 Harv. L. Rev. 920, 934-935 (1959). Cf. *Direct Sales Co.* v. *United States*, 319 U.S. 703, 709 (1943); *Commonwealth* v. *Shea*, 323 Mass. 406, 411 (1948). The holdings which conceptually and practically separate the two types of criminal activity do so because of fundamental distinctions between them. As has already been discussed, the gist of conspiracy rests in the "agree[ment] [between the conspirators] to work in concert for the criminal or corrupt or unlawful purpose" (*Commonwealth* v. *Dellinger*, *supra* at 556) and it is that agreement

which constitutes the criminal act and which generally serves to manifest the requisite criminal intent. See discussion in 72 Harv. L. Rev. at 925-927. On the other hand, accomplice liability has a "broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy." *Pereira* v. *United States,* 347 U.S. at 11, citing *Nye* v. *Nissen,* 336 U.S. 613, 620 (1949). Accomplice liability is based on the defendant's desire to make the crime succeed and is usually established by proof that the defendant was present at the scene, that he assented to the crime occurring, and that he put himself in a position where he could render aid to the perpetrator if it should become necessary. *Commonwealth* v. *Morrow,* 363 Mass. 601, 608-609 (1973), and cases cited. See also *Commonwealth* v. *Blow,* 370 Mass. 401, 407-408 (1976); *Commonwealth* v. *Soares,* 377 Mass. 461, 470 (1979). Absent from the formulation of accomplice liability is the necessity of establishing an agreement or consensus in the same sense as those terms are used in describing the agreement or combination which hallmarks a conspiracy.[3] When a defendant is convicted of conspiring with

---

[3] The Commonwealth's argument meshing the two concepts perhaps derives from misplaced reliance on Mr. Justice Holmes' famous epigram that a conspiracy is "a partnership in criminal purposes." *United States* v. *Kissel,* 218 U.S. 601, 608 (1910). Styling every joint venture crime as a type of partnership would automatically make each actor at the scene a member of a conspiracy. But a partnership contemplates the partners' arriving at an agreement before the partnership engages in its business. Cf. *Commonwealth* v. *Winter,* 9 Mass. App. Ct. 512, 525 (1980). To avoid reasoning along such lines, the Model Penal Code rejected inclusion of "the analogy of partnership . . . in the formal definition [of conspiracy]" and instead rested "the core of the conspiracy idea . . . on the primordial conception of agreement," Model Penal Code, Comments to § 5.03, at 116-117 (Proposed Official Draft 1962). In *Commonwealth* v. *Stasiun,* 349 Mass. 38, 48 (1965), the Supreme Judicial Court also advised against pressing the metaphor of a partnership too far in relation to conspiracy. The proposed Massachusetts Criminal Code, c. 263, § 48(a) and (b) (1972), follows these recommendations by squarely basing its definition of criminal conspiracy on the necessity for an agreement. Nor can the Commonwealth justifiably rely in support of its argument on statements as to conspiracy such as "[c]ommon purpose may be inferred from concerted

others to commit a crime, the conviction stems from, and is designed to punish, the unlawful agreement which preexists commission of the substantive offense. This is why proof of the conspiracy typically involves circumstantial evidence aimed at establishing a consensus prior to the commission of the target offense. Execution of the crime thus represents performance of the agreement. But because the conspiracy for practical purposes is at least one step removed from the substantive offense, the offense does not substitute for the agreement and the fact finder's analysis of the conspiracy evidence is logically directed at ascertaining whether an underlying agreement exists.[4] As the Eighth Circuit stated, in a different factual context: "To warrant a conviction for conspiracy . . . the evidence must disclose something further than participating in the offense which is the object of the conspiracy; there must be proof of the unlawful agreement, either express or implied, and participation with knowledge of the agreement." *Dickerson* v. *United States,* 18 F.2d 887, 893 (8th Cir. 1927).[5] See *United States* v.

---

action converging to a definite end" (*Commonwealth* v. *Beal,* 314 Mass. 210, 221 [1943]), or that "conspiracy may be indicated by an unarticulated 'affirmative acquiescence to the object of a conspiracy.'" *Commonwealth* v. *Schoening,* 379 Mass. 234, 240 (1979), quoting from *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 250, 303 (1971). These statements broadly describe the evidence from which the conspiratorial relationship can with reason be inferred, but they do not define the character of the crime itself. See Model Penal Code, *supra* at 116.

[4] There is nothing to the contrary in *Commonwealth* v. *Deagle, ante* 563 (1980). The discussion at 566 of that opinion assumed, but without deciding, that the agreement implicit in the actual perpetration of any joint venture might be chargeable as a conspiracy, but the decision in that case turned on the absence of sufficient evidence of joint participation.

[5] The conspiracies charged in this case and the two Federal cases next cited involved the question of responsibility of a defendant for conspiracy when he aids an existing conspiracy without knowledge that the conspiracy exists. But the sense of the rule expressed is aptly applied to this case because the rule underscores the need to look to the nature of the intended understanding to find an agreement rather than drawing the conclusion that there was a conspiracy simply from the fact of adherence by two or more people to a joint criminal venture. Professor Marcus in his compre-

*Winn,* 411 F.2d 415, 418 (10th Cir. 1969) ("[i]t is not enough [for a conspiracy conviction] that the evidence might have been sufficient to support an aider and abettor conviction"), and *United States* v. *Cowart,* 595 F.2d 1023, 1030-1031 (5th Cir. 1979). See also Model Penal Code, Comments to § 5.03, at 117 (rejecting in an analogous context the notion that "aid without consensus should suffice for a conspiracy between the aider and the beneficiary of his aid"); LaFave & Scott, Criminal Law 515 (1972) ("A much simpler question is whether one must be guilty of engaging in a conspiracy with the principal in the first degree in order to be his accomplice. The answer is no . . ."). Implicit support for our conclusion is also contained in the following statement from *Commonwealth* v. *Stasiun,* 349 Mass. 38, 48 (1965): "[P]unishment [for conspiracy] is imposed for entering into the combination. This is not the same thing as participating in the substantive offense which was the object of the conspiracy." A contrary holding on the facts we are considering would confuse certain settled aspects of the law of conspiracy[6] and would tend unnecessa-

---

hensive empirical study of the agreement element of conspiracy describes the distinction as "in theory . . . a subtle one" but in practice one of considerable importance because "punish[ing] . . . a person [who adheres to a joint criminal venture] for conspiracy is to turn the theory of conspiracy on its head . . . such punishment would be for the criminal act that is the object of the combination, not for the agreement that leads to the criminal objective." Marcus, Conspiracy: The Criminal Agreement in Theory and Practice, 65 Geo. L.J. 925, 956 (1977).

[6] It is established law that conspiracy to commit an offense and the subsequent commission of the crime normally do not merge into a single punishable act. *Iannelli* v. *United States,* 420 U.S. 770, 777 (1975). Perkins, Criminal Law 618-619 (2d ed. 1969). The necessity of proving a separate agreement underlies the merger rule and supports the settled rule that commission of a substantive offense and a conspiracy to commit it are distinct and "a plea of double jeopardy is no defense to a conviction for both . . . [unless] the substantive offense and the conspiracy are identical . . . ." *Pereira* v. *United States,* 347 U.S. 1, 11 (1954). Finding the conspiratorial agreement solely in the consensus existing between accomplice and perpetrator would raise serious questions whether the offender is being exposed to jeopardy or, at the very least, would create sentencing problems under the principles of *Kuklis* v. *Commonwealth,* 361 Mass. 302 (1972), based on the notion that

rily to expand its already elastic and pervasive definition by "blur[ring] the demarcation line between a conspiracy to commit an offense and the substantive offense which is the object of the conspiracy."[7] *Ramirez* v. *State*, 371 So. 2d 1063, 1066 (Fla. Dist. Ct. App. 1979). "[A]cts of aiding and abetting clearly make each actor a principal in the substantive offense . . . but cannot, without more,[8] also make each actor a principal in the crime of conspiracy to commit such offense . . . ." *Id.* We conclude that in this case the evidence of the confederation at the scene was insufficient to warrant the defendant's conviction of conspiracy.

The judgment is reversed, the verdict is set aside, and judgment is to be entered for the defendant.

*So ordered.*

the "realities of the offenses and the circumstances within which they occur" (*Costarelli* v. *Commonwealth*, 374 Mass. 677, 684 [1978]), were identical. See also concurring opinion of Justice Kaplan in *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 580-582 (1977).

[7] Massachusetts has been careful to restrict conspiracy to its traditional perspectives. For example, in *Commonwealth* v. *Stasiun*, 349 Mass. 38, 47-49 (1965), the Supreme Judicial Court rejected the prevailing Federal rule expressed in *Pinkerton* v. *United States*, 328 U.S. 640 (1946), that participation in a conspiracy renders the conspirator vicariously liable for all substantive offenses in furtherance of the agreement irrespective of his knowledge of or participation in them.

[8] Of course, a fact finder can consider and permissibly infer the existence of a conspiracy from the circumstances surrounding the commission of the crime. For example, the sophistication surrounding the execution of the Brink's robbery (*Commonwealth* v. *Geagan*, 339 Mass. 487 [1959]) would warrant a conclusion that its perpetrators had conspired and prepared in advance to commit it. But there the facts establishing the "more" necessary to convict the accomplices of conspiracy consisted of the numerous incidental circumstances manifested at the scene of the crime and elsewhere which demonstrated planning and pursuit of a prearranged systematic course of action. Cf. *Commonwealth* v. *Dellinger, supra*, discussing difficulties in a prosecution for conspiracy when the substantive crime has been abandoned and the Commonwealth cannot reverse engineer the conspiracy from the commission of the target offense.